## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

CASHMAN EQUIPMENT CORP.                    CIVIL ACTION NO.: 10-00021

VERSUS                                     JUDGE SHELLY D. DICK

BOH BROS. CONSTRUCTION CO., LLC            MAG. RICHARD BOURGEOIS

## ORDER AND REASONS

### I.      PROCEDURAL POSTURE AND BACKGROUND

In early 2005, Boh Bros., a Louisiana maritime construction contractor,[1] was working on a bridge project in Sanibel Island, Florida, when the crane it was using collapsed, killing an employee and resulting in the total loss and destruction of the crane.  After this horrific event, Boh Bros. sought out Cashman Equipment Corporation, a Massachusetts based marine equipment company, to lease a replacement crane in order to complete its work on the Sanibel Island Bridge project.[2]  In May of 2005, Boh Bros. agreed to lease or charter a crane barge combination from Cashman at a rate of $45,000 per month.[3]  The agreement became effective on May 7, 2005.  Boh Bros. returned the crane barge to Cashman's facility in New Orleans East in July of 2008.

In 2009, after the crane barge was returned to Cashman, demands were placed upon Boh Bros. for certain repair costs and unpaid charter hires.  Apparently, it was at this point in time, that the parties realized they had contrary positions on the proper interpretation of their agreement.  On the most fundamental level, the parties disagree

---

[1] Boh Bros. is a Louisiana company with its principal place of business in Louisiana.

[2] Cashman specifically alleges that it is "a foreign corporation, licensed to do business in the State of Louisiana, with its local office located in Baton Rouge, Louisiana."

[3] Boh Bros. agreed to charter Cashman's JMC 95 which consisted of the Manitowoc 4100 ringer crane affixed to a modified steel barge ("crane barge").

about which documents comprise their agreement.  Cashman contends that the Charter Agreement is comprised of two discrete documents: a Bare Vessel Charter Agreement and an Equipment Lease Agreement.[4]  In contrast, Boh Bros. argues that, because neither party signed the Equipment Lease Agreement, it is non-binding and is not part of the parties agreement.  The parties also dispute who is financially responsible for certain repairs that were made to the crane barge under the terms of their agreement.

Unable to resolve their differences, on January 9, 2010, Cashman filed this federal maritime lawsuit[5] against Boh Bros. alleging breach of contract claims, seeking to recover payment for the total amount of charter hire owed[6] and for unpaid repair costs.[7]  On July 21, 2010, Boh Bros. answered Cashman's Complaint.[8]  Subsequently, on June 14, 2011, Boh Bros. filed a Counterclaim asserting its own breach of contract claims against Cashman.[9]  Boh Bros. seeks to recover damages for making repairs and providing replacement parts to the crane barge, including costs and labor associated with repair work, and for "down time" when Boh Bros.' crews were unable to work because the equipment malfunctioned or was being repaired.  Boh Bros. also seeks a judicial determination that it does not owe reimbursement for repairs it made to the leased equipment on Cashman's behalf.

The case was taken under advisement and the parties submitted post-trial memoranda following a three-day bench trial.[10]

---

[4] In the Complaint, Cashman refers to the Equipment Lease Agreement as an Equipment Rental Agreement.  Rec. Doc. 1, p. 3, ¶10.
[5] Rec. Doc. 1.
[6] During the bench trial Cashman withdrew its excessive usage claim.
[7] Cashman asserts that the Court had jurisdiction arising under 28 U.S.C. § 1333.  In the alternative, Cashman contends that the Court has jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C § 1367.
[8] Rec. Doc. 11.
[9] Rec. Doc. 27.
[10] Rec. Docs. 66, 70, 78, 79, and 79-1.

## II.   FINDINGS OF FACT

1. At all relevant times, Cashman owned the JMC 95, a barge with a Manitowoc 4100 series "ringer" crane attached to the barge hull ("crane barge").

2. Cashman purchased the subject crane in approximately 2003.  The house rollers installed on the subject crane were not new at the time of Cashman's acquisition of the crane in 2003.  These are the same house rollers that were on the crane at the commencement of the subject Charter. House rollers carry the load on top of the ring of the crane.

3. If properly lubricated and maintained house rollers have a long (20 plus years) useful life.[11]

4. The subject crane was inspected and load tested on October 4, 2004, and October 14, 2008.[12]

5. The Parties, Cashman as Owner and Boh Bros. as Charterer, entered into a "Bare Vessel Charter Agreement" dated May 7, 2005 ("Charter") for the charter on a  "'bare boat' basis of the Barge (Vessel) known as JMC 95".[13]

6. The term of the Charter, in Section 5, is erroneously represented to commence on May 7, 2005, and terminate on January 7, 2005.

7. The Charter rate for the crane barge was $45,000/month.

8. The Charter contains a "Special Provision" which provides: "This charter agreement is one part of the charter. The second part of the charter is the

---

[11] The testimony was that with proper maintenance and lubrications house rollers can last upwards of 20 years and according to at least 1 witness indefinitely.
[12] Trial Exhibits, C-27 and C-28.
[13] Trial Exhibit, J-1.

Equipment charter. Both are utilized together for this Charterer." (emphasis original)[14]

9.  Boh Bros. received the Equipment Lease contemporaneous with receiving the Charter Agreement.

10. Under the Charter, the Charterer (Boh Bros.) agreed to "maintain the Vessel in the same condition as at delivery, make all repairs necessary to keep the Vessel in the same condition as at delivery, and assume all risk of damage or loss, [except ordinary wear and tear]".[15]

11. On May 6, 2005 an on-hire survey of the barge was completed by Wright Marine Surveying.[16]

12. Henry Landry, on behalf of Boh Bros., and Skip Broussard, on behalf of Cashman, conducted a joint "Walkaround Survey" of the crane in May of 2005 at the commencement of the lease.[17]

13. In May of 2005, after the "Walkaround Survey" of the crane by the parties Cashman paid to repair hydraulic leaks on the crane.  The repairs were made by Cashman contractor, Doug Bordelon.

14. In May of 2005, at the commencement of the Charter, Boh Bros. installed a new fuel tank. The fuel tank remained on the JMC 95 when the Charter ended.

15. Due to extensive pitting to the boom section present in May of 2005 at the commencement of the Charter, Boh Bros. installed a new boom section (a/k/a

---

[14] Trial Exhibit, J-1, Section 29.
[15] Trial Exhibit J-1, Section 12.
[16] Trial Exhibit J-5.
[17] Trial Exhibit CO-1, Section 2.

#27 boom) on the crane.  Boh Bros. replaced the boom heel to the top or head section of the boom.  Boh Bros. removed the replacement boom section when it returned the crane barge to Cashman in 2008.

16. Due to extensive pitting to the mast section present in May of 2005 at the commencement of the Charter, Boh Bros. replaced the mast section (a/k/a # 22 boom) on the crane with #22 boom that Boh Bros. had on hand. The condition of Boh Bros.' replacement mast was good as new with a value of $200,000.00.  The mast section which Boh Bros. replaced remained on the crane when the Charter ended.  Boh Bros. kept the mast section that it replaced in its own inventory.  The value of the mast section that was removed from the crane and retained by Boh Bros. was $21,000.00[18]

17. Boh Bros. replaced a radiator on the crane.  Cashman concedes that the radiator replacement was an "ordinary wear and tear" item and is, therefore, the responsibility of Cashman.  The cost of the radiator was $7,950.00.[19]

18. Between approximately May 9 and May 27, 2005, Boh Bros. made additional repairs to the crane and prepared it for use.  Boh Bros. performed this work to get the crane barge fit for duty replacing another "ringer crane" that had been damaged on a Boh Bros.' project involving construction work on a bridge located in Sanibel Island, Florida ("the Sanibel Island Bridge project").[20]  Boh Bros. did not bill Cashman for this work and has not requested reimbursement for these repairs in this suit.[21]

---

[18] Trial Exhibit C-19
[19] Trial Exhibit BB-17.
[20] See *Boh Bros Statement of Proposed Findings of Fact and Conclusions of Law*, Rec 63, p. 3, ¶10.
[21] *Id.*

19. The Charter commenced in May of 2005 and Boh Bros. physically took possession of the crane barge in May of 2005, but Boh Bros. did not remit any payment for charter hire until December of 2005.

20. When Boh Bros. commenced remittance of charter payments, it short-payed or took deductions from charter payments it remitted to Cashman.

21. In the beginning months of 2006, Cashman made numerous inquiries of Boh Bros. seeking an explanation of Boh Bros.' short-pays.

22. In or about late December of 2006, when the Sanibel Island Bridge project was coming to a close, Boh Bros. transported the crane barge back to its Almonaster yard in New Orleans, where it remained idle for approximately three weeks.

23. In January 2007, while the crane barge was at Boh Bros.' Almonaster yard, Boh Bros. replaced the rotten wooden mats between the ringer crane and the barge deck with steel structural support beams or H-beams installed longitudinally under the side rails of the crane, in an effort to address dragging of the crane's counter weights across the barge deck.  Representatives from Cashman and Boh Bros. determined that the installation of such steel beams was appropriate and Cashman agreed that Boh Bros. could deduct the cost from the charter hire rate.

24. Thereafter, Boh Bros. used the crane barge to replace and repair the "Twin Span" portion of Interstate 10, which traverses Lake Pontchartrain and connects New Orleans and Slidell ("the Twin Span project").

25. In March of 2007, Boh Bros. replaced the front right hook roller on the crane. The hook rollers guide the crane along the ring support and keep the crane from lifting off of the carbine.  Boh Bros. paid $4,679.33 for the tools and supplies necessary to replace the hook roller.  Boh Bros. performed the labor associated with the replacement.[22]

26. In March of 2007, Boh Bros. reported to Cashman that the barge deck was deflecting when the crane was in use.

27. In March of 2007, Cashman retained Francis Ducote of Ducote Engineering Associates, Inc., a naval architect, to investigate the cause of the barge deck deflection and to make recommendations to secure the subsurface structure of the barge.

28. In March of 2007, Ducote inspected the barge, performed certain engineering calculations, and recommended certain corrective measures to Cashman to strengthen the barge structure, including the installation of additional support below the deck of the barge and beneath the base of the crane.

29. The structural deficiencies, which became manifest by deck deflection of the barge, existed as of the time of the initial Charter to Boh Bros.

30. On approximately April 17, 2007, the JMC 95 was returned to the Cashman New Orleans East yard for the Ducote recommended repairs.

31. The crane barge remained on-hire during the Ducote repairs, and Boh Bros. paid the charter hire that accrued during the time that the barge was undergoing the Ducote repairs.

---

[22] Trial Exhibit BB-17, BB-00366.

32. Upon completion of the Ducote repairs, on or around May 28, 2007, the crane barge was dispatched by Boh Bros. back to its Twin Span project.

33. Boh Bros. received a credit of two weeks off their charter hire rental from Cashman.[23]

34. In 2007, Cashman unilaterally increased the Charter hire rate to $60,000/month.

35. Boh Bros. paid the increased charter hire rate and makes no claim for this increase in the hire rate.

36. In June 2007, Boh Bros. made repairs to the crane's boom tower, specifically, repairs to the hydraulics needed to turn the boom hoist gear box. The Court finds that these repairs were the result of normal wear and tear.[24]

37. Boh Bros. incurred $21,947.55 in costs to make the wear and tear repairs to the boom hoist gear box.[25]

38. During the course of the Charter, Boh Bros. took various credits or back charges against its monthly Charter, including the following:

    a. In November, 2005, Boh Bros. deducted $11,537.65 from Cashman Invoice # 4141[26]

    b. In January 2006, Boh Bros. deducted $9,005.16 from Cashman Invoice # 4374 (which amount included $7,950.00 for the Radiator)[27]

    c. In March 2006, Boh Bros. deducted $9,421.00 from Cashman Invoice # 4558[28]

---

[23] Trial Exhibit BB11.
[24] Cashman and Boh Bros. stipulated that if called to testify regarding the boom hoist gear box, Mike Evans' would testify that after the return of the Vessel to Cashman in 2008 he examined the oil in the boom hoist gear box and that the oil was not contaminated or milky. Evans would have testified that he and Skip Broussard could not determine what caused the pitting of the bronze gear inside the gear box.
[25] Trial Exhibit J-16; Trial Exhibit BB-5, BB-01117.
[26] Trial Exhibit BB-17, CEC-0157.
[27] Trial Exhibit BB-17, CEC-0156; Trial Exhibit BB-17, BB-00375.
[28] Trial Exhibit BB-17, CEC-0155.

    d.  In March 2007, Boh Bros. deducted $4679.00 from  Cashman Invoice # 5525 (for replacement of the Hook Roller on the crane)[29]

    e.  In April 2007, Boh Bros. deducted $20,670.00 from  Cashman Invoice # 5526[30] (for "Work on Bathtub Under Crane")

39. Danny Hudnall inspected the crane for Cashman on May 28, 2008.[31]

40. Boh Bros. returned the crane barge to Cashman in July of 2008.

41. On July 25, 2008, Cashman principal, James Cashman, emailed Durel "Skip" Broussard (Cashman's project director) and Brian Jones (Cashman's Vice President for Louisiana region; contract manager) inquiring as to the status of the Off-Hire Surveys on the JMC 95.[32]

42. Crane house rollers require preventative lubrication with grease.  Boh Bros' failed to properly lubricate the house rollers during the charter period resulting in severe damage to the crane's house rollers.[33]

43. After Boh Bros. returned the Vessel in 2008, Cashman used another ringer crane (the JMC 86) to undeck the subject crane from the barge in order to replace the damaged house rollers.

44. The house rollers on the subject crane could have been replaced by using hydraulic jacks instead of another crane.  Using hydraulic jacks to replace the house rollers would have taken 2 to 3 working days at a cost of $15,000[34] as opposed to 2 ½ months at a cost of $225,000.00.

---

[29] Trial Exhibit BB-17, BB-00366 and CEC-0154.
[30] Trial Exhibit BB-17, BB-00364 and BB-05346; Trial Exhibit BB15.
[31] Trial Exhibit, J-10.
[32] Trial Exhibit BB-20.
[33] Trial Exhibit CO-11, CEC-13.
[34] Rec. Doc. 63; Trial Exhibit BB-9, Manitowac Instructions for Replacing House Rollers on Model 4100 Series III Ringers; Trial Exhibit C-26.

45. An off-hire survey by marine surveyor, James E. Stansbury of Stansbury & Associates, Inc., was completed on December 9, 2008, and a survey report, prepared on December 16, 2008, reflected his findings.

46. The Off-Hire Survey was limited to the barge.

47. There was no formalized off-hire survey of the crane.

48. The Charter Agreement is silent as to which party is obliged to schedule the Off-Hire Survey, although the Charter Agreement specifies that the Charterer is responsible for the cost of the survey.

## III.   CONCLUSIONS OF LAW

### A.  Contractual Interpretation of the Charter Agreement

The Court finds that the Charter of the crane barge in this case is a maritime contract. Thus the interpretation of the contract is a matter of federal law. When interpreting a maritime contract the general rules of contract construction and interpretation apply.

Each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole.  Further, each provision of a contract must be given a meaning that renders it, along with all other provisions, effective rather than meaningless.

It is undisputed that the parties entered into and executed the Charter.[35] The Equipment Lease Agreement, although expressly incorporated into the Charter,[36] was not signed by the parties.  Boh Bros contends that because the Equipment Lease was not signed, there is no evidence that the parties assented to its terms.  In short, that

---

[35] Titled "Cashman Equipment Corp. Bare Vessel Charter Agreement", Trial Exhibit J-1.
[36] Charter ¶ 29.

there was no meeting of the minds.   Boh Bros. maintains that the unexecuted Equipment Lease creates an ambiguity which must be interpreted against Cashman, the drafter.[37]   Thus, Boh Bros. argues that to the extent the Charter is ambiguous between Section 28, which integrates the Charter and requires modifications to be signed and in writing, and Section 29, which references an Equipment Lease, that ambiguity must be interpreted in favor of Boh Bros. position, which is that the Equipment Lease is not binding because it was not signed and because the parties could not agree on its terms. Boh Bros.' argument fails.

Boh Bros. was provided with the Equipment Lease contemporaneous with the Charter.   As a form of maritime contract, a Charter, such as the one in this case, is generally subject to the rules and principles of construction for ordinary commercial contracts.   A charter comes into existence when the parties have a meeting of the minds on the essential terms of the charter.[38]   There is authority for the proposition that a charter need not be signed to be legally binding.   Indeed, an oral charter is valid and enforceable.[39]   When interpreting the Charter, state contract law may be applied to the extent that it does not conflict with admiralty principles.[40]

In this case, both the Charter and the Equipment Lease unambiguously reference the other.   Citing recent Fifth Circuit authority,[41] Cashman contends that the two documents are to be read together as one "Contract" that governs the rights and obligations of Boh Bros. and Cashman.

---

[37] *Gabarick v. Laurin Maritime (America), Inc.*, 650 F.3d 545, 553 (5th Cir. 2011).
[38] *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co., Inc.,* 666 F.2d 932, 939 (5th Cir.1982); see also *E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia,* 673 F.Supp. 796, 799–800 (E.D.La.1987), aff'd, 876 F.2d 1168 (5th Cir.1989).
[39] *St. Paul Fire & Marine Ins. Co,* 666 F.2d at 939
[40] *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir.1995).
[41] *OneBeacon Ins. Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258 (5th Cir. 2011).

Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms, which shows a clear intent to incorporate that instrument into the contract, both instruments are to be construed together.[42] The incorporation by reference doctrine applies to maritime contracts.[43] Under both general contract principles and admiralty law, a separate document will become part of the contract where the contract makes "clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt."[44] Notice of incorporated terms is reasonable where, under the particular facts of the case, "[a] reasonably prudent person should have seen" them.[45]

The failure of the parties to sign the Equipment Lease is not fatal to its incorporation into the Charter. It is well-settled that unsigned documents, even electronic documents, can be incorporated into a contract by reference.[46] In this case, the facts establish that Boh Bros. was aware of the Equipment Lease. It was expressly incorporated into the Charter. Section 29 of the Charter emphasizes:

---

[42] See 11 Williston on Contracts § 30:25 (4th ed. 1999) ("Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument."); Cited in, *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.,* 648 F.3d 258, 267-68 (5th Cir. 2011)

[43] *One Beacon Ins. Co.* 648 F.3d at 267-68, citing, *New Moon Shipping Co., Ltd. V. MAN B&W Diesel AG,* 121 F.3d 24, at 30; *Cargill, Inc. v. Kopalnia Rydultowy Motor Vessel,* 304 Fed.Appx. 278, 281–82 (5th Cir.2008) (per curiam) *268 (rejecting an argument that an indemnity clause that was incorporated by reference into a berth application was not enforceable because the provision was not included in the text of the berth application itself).

[44] 11 Williston on Contracts at § 30:25 Terms incorporated by reference will be valid so long as it is "clear that the parties to the agreement had knowledge of and assented to the incorporated terms." See also *New Moon Shipping Co.,* 121 F.3d at 30.

[45] *One Beacon Ins. Co.,* 648 F.3d at 268, citing *Coastal Iron Works,* 783 F.2d 577, at 582 (5th Cir. 1986).

[46] *Id.* at 268. (In finding that terms available through a party's website were incorporated by reference into the parties' contract, the Fifth Circuit explained that "[w]e note that that contracts formed in whole or in part over the internet present relatively new considerations for the courts, and will continue to challenge the courts as the internet plays an increasingly important role in commerce.  However, '[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.'" *Id.* quoting (*Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 403 (2d Cir. 2004)).

**This charter agreement is one part of the charter. The second part of the charter is the Equipment charter. Both are utilized together for this Charterer**. (emphasis original)

Furthermore, Boh Bros.' actions evidence a knowledge of and intent to comply with the terms of the Equipment Lease.  Paragraph 2 of the Equipment Lease requires:

> BOTH PARTIES (SKIP BROUSSARD FOR CASHMAN AND HENRY LANDRY FOR BOH BROS) WILL CONDUCT A WALK AROUND SURVEY ON THE CRANE TO BE PERFORMED IN BOH BROS YARD ON MONDAY THE 9TH OF MAY. THEY WILL GENERATE A LIST OF ANY MECHANICAL PROBLEMS WITH THE CRANE. IT WILL THEN BE DETERMINED BY BOTH PARTIES WHAT NEEDS TO BE REPAIRED AND TO WHOSE ACCOUNT IT WILL BE BILLED. (emphasis original).

This is exactly what transpired.  Boh Bros.' actions in this regard manifest its assent to the terms of the Equipment Lease which were incorporated into the Charter.

Boh Bros. took various deductions and credits from its monthly charter hire remittances to Cashman. Boh Bros. contends that Skip Broussard, Cashman's operations supervisor verbally authorized these deductions. The question thus becomes, to what extent, if any, can the parties verbally amend the express provisions of the Charter.  Cashman urges that alleged subsequent verbal modifications of the parties' written contract are unenforceable.  At trial, Boh Bros. offered evidence of subsequent oral modifications and amendments that, while controverted, were admitted without objection.  However, the parol evidence rule is a "substantive rule of contract law and not a rule of evidence."[47]  Generally in admiralty law, the rule is that "[w]hen two parties have made a contract and have expressed it in a writing to which they have both asserted as the complete and accurate integration of that contract, evidence, whether

---

[47] *Merchants Nat. Bank & Trust Co. of Indianapolis v. Prof'l Men's Ass'n*, 409 F.2d 600, 602 (5th Cir. 1969); *Harville Rose Serv. v. Kellogg Co.*, 448 F.2d 1346 (5th Cir. 1971).

parole or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."[48]

Paragraph 28 of the Charter provides:

Incorporation of Agreement - This instrument contains the entire and only agreement between the parties and no oral statement or representations or prior written matter not contained in this instrument shall have any force and effect.  The parties agree that all disputes hereunder shall be decided in accordance with paragraph 17.  **ANY ORAL OR WRITTEN MODIFICATION OF THIS AGREEMENT MUST BE MADE IN A WRITING SIGNED BY THE PARTIES.** (emphasis original)

The contract is the law between the parties.  Accordingly, any alleged subsequent oral modifications of the Charter are not binding or enforceable.

## B. Crane Barge Repair Costs

In its post-trial recapitulation of damages[49] Cashman contends that it is entitled to recovery of $380,645.74 in repair costs[50] and $175,760.00 for unpaid monthly hire payments.  Cashman contends that upon return of the crane barge in July of 2008, Cashman performed repairs to the crane barge that were caused by neglect or failure of maintenance by Boh Bros.  Boh Bros. denies that the repair costs claimed by Cashman were necessitated by lack of maintenance or neglect.  Boh Bros. contends that the end-of-hire repairs undertaken by Cashman were either attributed to ordinary wear and tear and thus Cashman's responsibility or were in the nature improvements because Cashman hoped to lease the Crane Barge to another company.[51]

---

[48] *Har-Win, Inc. v. Consolidated Grain & Barge Co.*, 794 F.2d 985, at 987 (5th Cir. 1986)(quoting *Battery Steamship Corp. v. Refineria Panama*, 513 F.2d 735, at 738 (quoting A. Corbin, *Contracts* §573)).

[49] Rec. Doc 79-1, page 6

[50] Cashman's repair  numbers do not add up. While Cashman asks for $380,645.74 in repair damages, it offered evidence of only $334,521.16 in repair costs, namely, $70,556.16 for boom hoist repairs, $38,695.00 for house roller parts and $225,000.00 for equipment to replace house rollers.

[51] Boh Bros alleges that Cashman was repairing the Crane Barge because it intended to lease it to Cajun Contractors.

Boh Bros. counterclaims seeking $915,349.28[52] in damages for downtime and repair costs incurred by Boh Bros. for alleged latent defects for which Cashman was responsible.  A significant portion of Boh Bros.' counterclaim damages are for downtime while the JMC 95 was undergoing repairs.

### a. **Downtime of the Crane Barge**

Boh Bros. claims $564,729.27 in damages for alleged lost or downtime of the crane barge while it was on hire.  Specifically Boh Bros. claims:

January – December, 2005 alleged downtime $117,436.83[53]

January – December, 2006 alleged downtime $59,916.75[54]

January – December, 2007 alleged downtime $286,446.54[55]

January – December, 2008 alleged downtime $100,929.15[56]

Section 7(a) of the Equipment Lease provides that "Monthly Rental Rates shall not be subject to any deductions on account of non-working time in the month . . . ."[57] Similarly, Section 23 of the Charter provides that "Once possession of the Vessel is accepted, [Boh Bros] assumes full responsibility for the Vessel, its use and operation during the entire charter period, and [Cashman] assumes no liability for loss of time or damage or expense on account of accidents . . . and will make no allowance for loss of time due to weather or surface conditions, suspension of work *or any other reason.*"[58]  A plain reading of the contract precludes Boh Bros.' claims for compensation for lost or

---

[52] Like Cashman, Boh Bros. numbers do not add up. In its Counterclaim (Rec. Doc. 27) and its post-trial damage recapitulation of damages (rec. Doc. 78) Boh Bros. claims damages for downtime and repairs totaling $915,349.28. However, Boh Bros. only presented evidence for $911,526.75 comprised of $546,729.27 in downtime, and $346,797.48 in repairs.
[53] 147 hours at $798.89/hr. Rec. 78.
[54] 75 hours at $798.89/hr. Rec. 78.
[55] 298 hours at $798.89/hr. Rec. 78.
[56] 105  hours at $798.89/hr. Rec. 78.
[57] Trial Exhibit CO-1.
[58] Trial Exhibit J-1. (emphasis added).

downtime.  The Court concludes that as a matter of contract, Boh Bros. cannot recover losses due to downtime.[59]

### b.  Ordinary Wear and Tear, Latent Defects or Maintenance

Boh Bros. seeks damages totaling $346,797.48 for parts and repair costs which it contends were incurred as the result of either latent defect or ordinary wear and tear. Section 8 of the Charter provides that:

> Charterer acknowledges that it has had the opportunity to review [the on-site survey] and the condition of the vessel and in all respects Charterer has chosen to accept the vessel in its condition and Charterer further acknowledges that Owner has fully performed its obligations to provide a seaworthy vessel hereunder. Owner does not Warrant the suitability of this equipment for Charterer's intended purpose.[60]

Section 12 of the Charter obliged Boh Bros.

> to make all repairs necessary to keep the Vessel in the same condition as at delivery and assumes all risk of damage or loss, ordinary wear and tear excepted, and agrees to redeliver the Vessel . . . in substantially the same condition as when accepted".[61]

Similarly, Section 8 of the Equipment Lease provides that:

> [Boh Bros] shall at [its] own expense maintain the Equipment in good operating condition, well greased, oiled, cleaned and repaired and in such condition shall return it to [Cashman].[62]

As a matter of contract Boh Bros. assumed all maintenance and repair responsibilities of the crane barge, save "ordinary wear and tear."  Boh Bros. was obliged to return the crane barge "in substantially the same condition as when

---

[59] "[Cashman] assumes no liability for loss of time" Trial Exhibit J-1, Sec. 23 of Charter. "Monthly Rental Rates shall not be subject to any deductions on account of non-working time in the month . . . ." Trial Exhibit CO-1, Section 7(a).
[60] Trial Exhibit J-1.
[61] Trial Exhibit J-1.
[62] Trial Exhibit CO-1.

accepted"[63] and to return the equipment "in as good a condition as existed at the start of the lease."[64]   Stated differently, Boh Bros. was responsible for all maintenance and repair of the crane barge, while Cashman was responsible for latent defects, that is defects or conditions that existed at commencement of the hire, and for ordinary wear and tear which occurred during the hire.

Although Boh Bros. originally sought $244,031.59 for the replacement of the pitted crane mast, Boh Bros. witness, Mitch Dixon testified that the true value of the "good as new" mast was $200,000.00 and that Cashman was entitled to an additional $21,000.00 credit for the removed mast section that Boh Bros. kept in its stock.[65]   Since the mast was extensively pitted at the commencement of the charter the Court concludes that Boh Bros.' expenditures for replacing the crane mast were a incurred as a result of a latent defect.  Nevertheless, the Court finds that Cashman is entitled to a credit of $21,000.00 for the mast section that Boh Bros. removed and that remained in Boh Bros.' stock at the conclusion of the charter.   Therefore, the Court finds that Boh Bros. is entitled to $179,000.00 for the replacement of the crane mast that remained on the crane when the crane barge was returned to Cashman.[66]

Boh Bros. also seeks damages in the following amounts:

| | |
|---|---|
| For Parts/Repairs Made in 2005 | $ 3,772.53[67] |
| For Parts/Repairs Made in 2006 | $ 6,500.81[68] |
| For Parts/Repairs Made in 2007 | $ 65,611.40[69] |

---

[63] Trial Exhibit, J-1, Section 12.
[64] Trial Exhibit CO-1, Section 8.
[65] Trial Exhibit C-19.
[66] See Findings of Fact, No. 14.  Trial Exhibit BB-3, BB00903-BB00904.
[67] Trial Exhibit BB-7, BB01275.
[68] Trial Exhibit BB-7, BB01276.
[69] Trial Exhibit BB-7, BB01277.

For Parts/Repairs Made in 2008          $ 26,881.15[70]

**TOTAL:**          $102,765.89

As for these remaining damages, Boh Bros. offered evidence showing that some of the costs incurred in June of 2007 were for repairs made to the boom hoist gear box in the amount of $21,947.55. The Court finds that these repairs were the result of normal wear and tear and that Boh Bros. is entitled to recover $21,947.55. However, as for the remaining $80,818.34 for repair damages Boh Bros. seeks to recover, the Court finds that Boh Bros. has failed to offer evidentiary support showing the specific repairs made so the Court could make a judicial determination as to whether these repairs were latent or the result of ordinary wear and tear. Therefore, Boh Bros. is not entitled to recover these damages.

### c.  Deductions or Credits Taken by Boh Bros. for Repairs

During the course of the charter hire, Boh Bros. deducted a total of $55,315.14, which Boh Bros. alleges it incurred for repairs of latent defects of the crane barge. Boh Bros. maintains that these credits were approved by Cashman's project director Skip Broussard. Cashman denies that it approved of Boh Bros. taking any credits against the monthly hire rate. The Court finds that Boh Bros.' claim that the Charter was amended or modified by the alleged subsequent oral approval by Skip Broussard fails. However, to the extent that Boh Bros. has demonstrated that it incurred repair costs for latent defects or ordinary wear and tear, Boh Bros. is entitled to recover those amounts.

One such cost was $7,950.00[71] for repair of the radiator on the Crane which Cashman concedes was a normal wear and tear item. Boh Bros. also deducted

---

[70] Trial Exhibit BB-7, BB01278.
[71] Trial Exhibit BB-17, BB-0375. Invoice for Radiator.

$4,679.33[72] for the replacement of a hook roller in March 2007.  The Court finds the evidence was persuasive that the replacement of the hook roller was due to a latent defect; therefore, Boh Bros. is entitled to reimbursement in the amount of  $4,679.33.  In April 2007, Boh Bros. also deducted $20,670.00 for work it conducted on the "bathtub under the crane."   The Court finds that Boh Bros. failed to demonstrate by a preponderance of the evidence that these repairs were latent or ordinary wear and tear repairs.  Accordingly, Boh Bros. is not entitled to recover for work performed on the bathtub under the crane.

Boh Bros. also claims that it is entitled to recover $9,421.00, which was a back charge from March of 2006, but offered no evidence as to what repairs were made with this expenditure.  Therefore, the Court finds that Boh Bros. is not entitled to recover this amount.  For the same reasons, Boh Bros. is not entitled to recover for an $11,537.65 back charge from November 2005.[73]

### d.  When did Charter Terminate

The crane barge was back in Cashman's yard in July of 2008.   Boh Bros. contends that the Charter ended in July of 2008, but Cashman argues that the Charter continued until the Off-Hire Survey was completed in December of 2008, and Cashman completed all necessary repairs or January 8, 2009 revealed by the survey.   Cashman invoiced Boh Bros. for charter hire rates from July 16, 2008 through January 8, 2009; however, Boh Bros. refused to remit the remaining charter hire payment for this time

---

[72] Trial Exhibit BB-17.  Invoice for House Roller.
[73] In its Post-Trial Brief, Boh Bros. erroneously indicated that the $11,537.65 back charge related to a withholding it made in June of 2007.  This back charge was attributed to a withholding made in November 2005.  See Trial Exhibit BB-17, CEC-0157.

period. Cashman claims it is entitled to $175,760.00 for unpaid charter hire payments from Boh Bros. for this time period.[74]

Section 8 of the Equipment Lease provides that:

In the event the Equipment is rendered not serviceable or otherwise damaged through accidental or negligent damage, the rental shall continue until the Equipment is restored to serviceable condition, and in as good a condition as existed at the start of the lease period.[75]

Likewise, Section 5 of the Charter states:

It is expressly agreed that the Charter Hire shall not terminate until . . . an Off-Hire Survey has been performed. Additionally, should the Off-Hire Survey disclose damage to the vessel, charter hire shall continue until the vessel is returned to its condition as called out in the On-Hire Survey . . . [76]

Although Boh Bros. returned the crane barge in July of 2008, the Court finds that because the Off-Hire Survey was not conducted until December of 2008 and the necessary repairs were not completed until January 8, 2009, under the clear terms of the Charter, Boh Bros. owes charter hire rates throughout this time period. Boh Bros. is liable to Cashman for unpaid charter hire rates totaling $175,760.00.

### e.  Cashman's Claims for Off-Hire Repairs

Cashman submitted an invoice to Boh Bros. in March of 2009 in the amount of $387,468.23 seeking reimbursement for repairs Cashman made to the Boom Hoist Gear Box, replacement of the house rollers, and repairs to the crane's ring alignment. Cashman contends that these repairs were caused by Boh Bros.' failure to perform proper maintenance and under the terms of the Equipment Lease, Boh Bros. is

---

[74] Although the total Charter Hire rate due for this period equates to $271,840.00, Cashman only seeks to recover $175,760.00 due to three credits owed to Boh Bros. in the amounts of $1,280.00, $1,200.00, and $93,600.00.  Trial Exhibit C-11. Invoices #7123, #7165, #7226, #7393, #7530, #7584, #7649, #7691, and #7743 totaled $271,840.00.  Deductions for Invoices #7149 and #7148, and for payment made on July 19, 2010 totaled $96,080.00.
[75] Trial Exhibit CO-1.
[76] Trial Exhibit, J-1.

financially responsible for these repairs.[77]  During the bench trial, Cashman withdrew its request to recover $6,822.49 for the installation of the inspection window on the Boom Hoist Case.[78]  Therefore, the total amount Cashman seeks to recover for repairs it made is $380,645.74.

Cashman presented Boh Bros. with an invoice of $70,556.16 for the Boom Hoist Gear Box.[79]  The Court finds that Cashman failed to demonstrate by a preponderance of the evidence that the repairs performed on the Boom Hoist Gear Box were caused by Boh Bros.' negligence or neglect; rather, the Court finds that these repairs were latent defects.  Therefore, Cashman is not entitled to recover any damages for the Boom Hoist Gear Box repairs.

Cashman also seeks to recover repair costs associated with the house rollers totaling $38,695.00.[80]  The Court finds that because the house rollers were damaged due to Boh Bros.' negligence and failure to properly maintain, under the terms of the Charter Cashman is entitled to recover these repair costs.

Cashman seeks related cost totaling $225,000.00 for the use of a second ringer crane, the JMC 86, for 2.5 months.[81]  It was Cashman's position that it had to use the second ringer crane to replace the house rollers and remove the steel beams installed by Boh Bros.  The Court finds that pursuant to the Manitowac instructions or procedures, Cashman could have changed the house rollers using a hydraulic jack, instead of a second ringer crane, for less time and for a total cost of $15,000.00.

---

[77] Sections 8, 10, and 12 of the Equipment Lease. (Trial Exhibit CO-1).
[78] Trial Exhibit C-11, CEC-000194b, line 8.  Cashman added an inspection window so they could see worm gear on the bottom.
[79] Trial Exhibit C-11, CEC-000194b, line 34; Trial Exhibit CO-11, CEC-0015.
[80] Trial Exhibit C-11, CEC-00194b, line 33; CO-11, CEC-0014.
[81] Trial Exhibit C-11, CEC-000194b.

Accordingly, to the extent Cashman seeks recovery of costs for the use of the JMC 86 to repair the house rollers, the Court finds that Cashman is entitled to $15,000.00.  The Court also finds that Cashman has failed to demonstrate by a preponderance of the evidence that the steel beams installed by Boh Bros. caused any damage to the barge or misalignment to the crane ring system.  Therefore, Cashman is not entitled to recover the remaining costs expended on the second ringer crane for steel beam removal.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on <u>March 20, 2014</u>.

**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**